**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------X
ZAHIED ("TONY") MOHAMMED,                    :
                                              :    Index No.:
                    Plaintiff,            :
                                              :
            v.                              :    **COMPLAINT**
                                                :
DAISY SOROS,                                 :
                                              :    **Jury Trial Demanded**
                    Defendant.            :
---------------------------------------------------------------X

Plaintiff Zahied Mohammed alleges against Defendant Daisy Soros as follows:

**PRELIMINARY STATEMENT**

> In life you can bargain for and buy almost anything. You can bargain for and buy mansions. You can bargain for and buy cars and fine jewelry. You can bargain for and buy almost anything – any of life's comforts that you were to conjure up in your mind. But, thank God, that there are some things in life you cannot bargain for or buy. You cannot bargain for or buy justice, because if you do, what you will get is not going to be justice. You cannot bargain for or buy love, because if you do, what you will get is not going to be love. And you cannot bargain for or buy dignity, because if you do then what kind of person would you end up being?
>
> -   *Kenneth P. Thompson, Esq.*[1]

1.      Despite all her wealth and privileges, there is nothing at all dignified about the

way Defendant Daisy Soros – the billionaire widow of the late Paul Soros, who is the brother of

business icon George Soros – treats her personal staff of employees. Ms. Soros subjected

Plaintiff Zahied Mohammed, her former chauffer/housekeeper, to a barrage of discriminatory,

racist, homophobic and retaliatory conduct that ultimately became too much for him to handle.

---

[1]      Kenneth P. Thompson is the former Brooklyn District Attorney who passed away in October 2016 following a bout with cancer. Excerpted above is from Mr. Thompson's closing argument in the trial of Osorio v. Source Enters., No. 05 Civ. 10029 (JSR) (slightly edited).

Mr. Mohammed complained to Ms. Soros that her conduct both towards him and other employees was unwarranted, and she responded by threatening to use her status and power to fire him and keep him quiet.  At that point, Mr. Mohammed felt he had no choice and was forced to end his employment with Ms. Soros.

2.      Unfortunately, Mr. Mohammed knew all too well that Ms. Soros disregards the law and mistreats her employees.  Mr. Mohammed was employed by Ms. Soros when she fired a former husband-and-wife team – who had been working for Ms. Soros for two-and-a-half years – on the day the husband was released from the hospital after being diagnosed with brain cancer. Although Ms. Soros' late husband died following a battle with cancer, and Ms. Soros is a donor to cancer programs, she said to Mr. Mohammed, "**I could not deal with them with [the husband] being sick, it's too much responsibility.**"  Ms. Soros also cut off their health insurance without notice, at a time when they obviously needed health insurance most.

3.      Mr. Mohammed brings this action to send a message to Ms. Soros and to all employers throughout the State of New York and the entire country that no one is above the law, no matter how much wealth and power one might have amassed.  Mr. Mohammed seeks not only monetary damages for the unlawful conduct that he was subjected to, but also injunctive relief requiring that Ms. Soros follow the law so that no one else has to go through the harassment and discrimination suffered by Mr. Mohammed.  This action is brought pursuant to the Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"), the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq*. ("NYCHRL"), the Fair Labor Standards Act, 29 U.S.C. §201 *et seq*. ("FLSA"), the New York Labor Law, §650 *et seq.* ("NYLL") and the Massachusetts General Law chapters §§149, 151 *et seq.* ("Mass. G.L.c.").

## JURISDICTION AND VENUE

4.      Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has subject matter jurisdiction over this action because this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981 and the FLSA.

5.      Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Plaintiff's related claims under the NYLL, NYSHRL,NYCHRL and Mass. G.L.c. as all of the alleged unlawful conduct arose out of a common nucleus of facts stemming from Plaintiff's employment with Defendant.

6.      Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district because a substantial part of the events or omissions giving rise to this action occurred in this district.

## ADMINISTRATIVE PREREQUISITES

7.      Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

8.      Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

9.      Plaintiff Zahied Mohammed is a former employee of Defendant.  Mr. Mohammed currently resides in Queens County, New York.  At all relevant times, Mr. Mohammed met the definition of an "employee" under all applicable statutes.

10.     Defendant Daisy Soros is an adult resident of New York State.  At all relevant times, Ms. Soros met the definition of a "supervisor" and "employer" of Plaintiff under all applicable statutes.

## FACTUAL ALLEGATIONS

**Background**

11.      Ms. Soros was married to the late business magnate Paul Soros.  Paul Soros is the older brother of the financier George Soros, whose net worth is estimated to be approximately $25 billion.  Although George Soros is the more commonly known of the brothers, Paul Soros was – in his own right – a billionaire many times over as well.

12.      Paul Soros was a mechanical engineer who revolutionized the international transportation and shipping industry and founded Soros Associates, a company which still to this day operates, designs and develops bulk handling and port facilities and has a presence in more than 90 countries.  In 2013, Mr. Soros passed away at age 87 after a battle with cancer. Although Paul Soros' net worth when he passed away is unknown, he explained in his memoir titled "American (Con)quest" that after he reached the age 65, his taxable income exceeded $100 million per year.[2]

13.      Ms. Soros lives on the Upper East Side on Manhattan, just off of Central Park at 969 Fifth Avenue.  Her residence is two entire floors of the building.  Starting in approximately October 2013, Mr. Mohammed was Ms. Soros' weekend chauffer/butler/housekeeper.  Mr. Mohammed would generally work from approximately 4:00 p.m. on Fridays through 10:00 p.m. on Sundays, at which point Ms. Soros' regular staff would return for the week.

**Ms. Soros' Discrimination Against Mr. Mohammed**

14.      During his employment, Mr. Mohammed – who is Black – was horribly mistreated by Ms. Soros on account of his race and sexual orientation.

---

[2]      Doing simple math, from then, until his death, he would have earned at the very least $2.2 billion, and likely multiples of that number.

15.     Ms. Soros would often berate and belittle Mr. Mohammed in a manner she never treated any White or heterosexual employees.

16.     For instance, by way of example only, when Mr. Mohammed started working for Ms. Soros she required him to sleep in a guest room at her apartment, but refused to let him sleep in an actual bed.  Instead, she actually forced Mr. Mohammed to sleep *on the floor* at the foot of the guest beds, depicted below:



17.     Ms. Soros never required any White or heterosexual employees to sleep on the floor.

18.     Ms. Soros even allowed her dog to sleep on the guest bed instead of on the floor.

19.     In fact, Mr. Mohammed recalls that a former employee – a chauffer and butler who at the time worked for Ms. Soros during the week – even told Mr. Mohammed that he complained to Ms. Soros:

> "**Why do you force Tony** [Mr. Mohammed] **to sleep on the floor rather than sleep on the guest bed?  Because he's Black?**"

20.     Mr. Mohammed complained about this treatment repeatedly, and only after more than *one year* of employment did she relent and actually let him sleep on a bed rather than on the floor, but still required him to put a separate sponge mattress on top of the regular bed mattress to ensure that he did not sleep directly on the guest bed itself.

21.      Ms. Soros also frequently made derogatory racist comments.

22.     By way of example only, while walking along the Upper East Side of Manhattan, Ms. Soros told Mr. Mohammed "**There are so many ugly fat Black people.  They could not be living here** [referring to the Upper East Side]**.  They should go back to Brooklyn or uptown. This couldn't be their neighborhood**."

23.     Mr. Mohammed found this extremely offensive and told Ms. Soros that she should "not say things like that."  Despite Mr. Mohammed's complaints, Ms. Soros continued to make offensive comments to Mr. Mohammed.

24.     For instance, while Mr. Mohammed was taking care of Ms. Soros during her stay in Nantucket (where Ms. Soros spends her summers), Ms. Soros told her colleague that she believed "**every Black person was given the same opportunities, some of them just didn't use it.**"

25.     Ms. Soros was also hypersensitive about the appearance of Mr. Mohammed's hair, something she never addressed with her White employees.  For example, on one occasion she said to Mr. Mohammed: "**Shave your facial hair because you look ugly and I don't want my friends to see you like that.**"

26.     On one occasion, Ms. Soros suggested that Mr. Mohammed should be content that he gets the privilege to work for her because, "**I know where you come from.  You come from Trinidad where people have nothing.**"

27.     Mr. Mohammed complained constantly about the way he was mistreated by Ms. Soros.  However, Ms. Soros never addressed his concerns.

28.     Ms. Soros is also well aware that Mr. Mohammed is gay and degraded him for his sexual orientation.  For example, on multiple occasions Ms. Soros proclaimed to him: "**It's better to be married to your husband than to go out there and get AIDS.**"

29.     In response, Mr. Mohammed explained that it is an offensive stereotype to think that all gay people are promiscuous and have AIDS, to which Ms. Soros dismissively responded, "**That's what you all say, you all claim you're not promiscuous but you are.**"

30.     Ms. Soros said to Mr. Mohammed that her friend "doesn't look very well."  When Mr. Mohammed asked what the problem was, she responded: "**Do you think he has it?**"  Mr. Mohammed replied, "**What do you mean by has it?**"  Ms. Soros answered: "**AIDS.**"  Mr. Mohammed then informed her that her assumption was "not very nice and not every gay person has AIDS."

31.     After Mr. Mohammed introduced Ms. Soros to his partner, Ms. Soros asked Mr. Mohammed "**which one of you is the man and which one of you is the wife?**"

32.      Whenever Mr. Mohammed told Ms. Soros to stop being unprofessional and rude, she would reply: "**Don't be a sissy.  Stop complaining and be a man**."

**Unlawful Wage Practices**

33.      In addition to the discriminatory treatment, Ms. Soros also failed to properly pay Mr. Mohammed as required by the FLSA, NYLL and Mass. G.L.c.

34.     During the majority of Mr. Mohammed's employment, Ms. Soros was serviced during the week by a married couple.

35. When the married couple would leave for the weekend, Mr. Mohammed would take over. Mr. Mohammed would typically work from approximately 4:00 p.m. on Fridays through 10:00 p.m. on Sundays.

36. In addition to being the weekend "help," Mr. Mohammed also worked for Ms. Soros on a full-time basis when she went on vacation to Nantucket during the summer. Ms. Soros would typically spend July and August in Nantucket, and Mr. Mohammed would join her for the month of July, while the married couple would join her for August.

37. During the month in Nantucket, Mr. Mohammed was required to work seven days per week. On many occasions, he was forced to wake up during his sleeping hours to assist Ms. Soros. Mr. Mohammed was required to be on duty and available to assist Ms. Soros 24/7 while they were in Nantucket.

38. Each week in Nantucket, Mr. Mohammed worked well in excess of 40 hours per week.

39. NYLL § 161 requires that domestic workers be provided at least one 24-hour period of rest during every seven-day period, unless the employer has agreed to pay the employee at the overtime rate during the rest day, and the employee agrees to this arrangement.

40. However, Ms. Soros never paid Mr. Mohammed any overtime rate at all, and never sought his agreement to work seven days in a row (in fact, a full month in a row without a single day off) while working for her in Nantucket.

41. Mass. G.L.c. 149 § 190(b) requires that domestic workers be provided at least one 24-hour period of rest during calendar week and at least 48 consecutive hours during each calendar months, unless the employer has agreed to pay the employee at the overtime rate during the rest day, and the employee agrees to this arrangement in writing.

42.     Ms. Soros never paid Mr. Mohammed any overtime rate at all, and never sought his agreement to work during his entitled "rest" days, let alone put this agreement in writing.

43.     Moreover, NYLL § 195 and Mass. G.L.c. 149 § 190(l)  require employers to provide employees with accurate wage statements with each paycheck showing, *inter alia*, the regular rate of pay, the overtime rate and the number of regular and overtime hours worked.  The purpose of these wage statements to ensure that employees are informed and aware of the terms of their compensation.  However, Ms. Soros failed to provide Mr. Mohammed with compliant wage statements.

44.     NYLL §195 also requires employers to provide new employees with a notice containing, *inter alia*, the rate of pay and overtime rate.  However, Ms. Soros never provided Mr. Mohammed with a compliant wage notice.

45.     Perhaps aware of her failure to pay employees properly, Ms. Soros employs many immigrants from foreign countries who may have less familiarity with the federal and state wage laws.  As such, on one occasion Ms. Soros admitted that the reason she hired immigrants is because "**it's cheap labor.**"

**Ms. Soros' Retaliation Against Mr. Mohammed and Constructive Discharge**

46.     Mr. Mohammed's hours and working conditions were brutal.  Mr. Mohammed would often work 18 or more hour days, with no breaks whatsoever.

47.     On one particular occasion when Mr. Mohammed complained to Ms. Soros that his hours created an unsafe work environment, Ms. Soros sarcastically said: "**OK, fine, I'll make my own fucking bed, and I'll make your fucking breakfast too!**"  Of course, Ms. Soros would never think to perform these tasks on her own and Mr. Mohammed continued to perform these tasks thereafter.

48.     Mr. Mohammed told Ms. Soros many times that "**you should treat your employees like human beings.**"  In response, Ms. Soros would say to Mr. Mohammed – in this and various other similar iterations – that:

> "**I have money and I can treat people however I want and who gives a fuck!  Don't you know who we** [her and her late husband Paul Soros] **are?**"

49.     On or about September 10, 2016, Mr. Mohammed complained to Ms. Soros that she had not paid him at all for two-and-one-half days he had worked for her in New York City. These were two days that Mr. Mohammed prepared Ms. Soros' New York City apartment for her in advance of her return from Nantucket.  Rather than simply paying him as required by law, Ms. Soros responded by saying "**It's always something with you!**"

50.     Mr. Mohammed then complained further that he deserved to be paid and he did not like the way Ms. Soros treated him, to which Ms. Soros replied, "I'm nice to everyone."  Mr. Mohammed responded:

> "You're not!  The way you told [a former employee] that she is fat and disgusting, that's not nice.  <u>**The way you treated [the employee who had cancer] when he got sick and then fired him due to his medical problems, that was not nice**</u>.  The way you forced me to sleep on the floor, that was not nice."

51.     Ms. Soros then threatened Mr. Mohammed in a raised voice: "**If you mention any of those things to anyone, I will fire you!**"  Ms. Soros then continued:

> "**My last name is Soros and I know some very powerful people. You are nobody and I will fire you the next time you talk to me about anything that is not your fucking business.**"

52.     Mr. Mohammed, having been told that he was not going to be paid for time that he worked, and then being threatened for termination for raising protected complaints of

discrimination, realized that he could no longer work in this discriminatory and hostile environment.

53.     Accordingly, Mr. Mohammed was constructively terminated.

**Ms. Soros' Discrimination Against A Married Couple/Employees**

54.     Mr. Mohammed is well aware that Ms. Soros' offensive and discriminatory treatment of her home help has not been limited to him.

55.     As stated above, just prior to Mr. Mohammed's constructive discharge, he had complained about Ms. Soros' discriminatory termination of an employee on account of his medical conditions.  In particular, Mr. Mohammed had said: "The way you treated [the employee who had cancer] when he got sick and then fired him due to his medical problems, that was not nice."

56.     Again, these other employees were a husband-and-wife team who worked for Ms. Soros as her full-time chauffer and housekeeper, respectively.  The married couple worked for Ms. Soros for – as best Mr. Mohammed can estimate – approximately two-and-a-half years.

57.     Mr. Mohammed is aware that in or around June 2015, the husband was unexpectedly hospitalized with brain cancer, and his wife was largely by his side when he was in the hospital.  At this time, Ms. Soros was preparing for her annual summer trip to Nantucket.

58.     Mr. Mohammed is aware that the husband was released from the hospital in or around late June 2015, and he and his wife went directly to Ms. Soros' apartment from the hospital.  As Mr. Mohammed recalls, they were both immediately fired.  As Mr. Mohammed understands it, Ms. Soros cancelled their health insurance without even informing them.

59.     Mr. Mohammed recalls the wife pleading with Ms. Soros to let her keep her job, but Ms. Soros refused.  Thereafter, Mr. Mohammed recalls Ms. Soros stating on many occasions

(they then spent the next month together in Nantucket) that as to their terminations, "**I could not deal with them with [the husband] being sick, it's too much responsibility.**" Ms. Soros then hired another couple to replace them.

60.     Soon after the married couple was fired, Mr. Mohammed learned that they had hired lawyers.  Also soon after, Mr. Mohammed was asked to join a conference call with Peter Soros (Ms. Soros' son) and an attorney whose name Mr. Mohammed cannot recall.  During that call, Mr. Mohammed was told not to speak with the married couple going forward.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of the Section 1981)

61.     Plaintiff hereby repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

62.     By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of his race and/or sexual orientation in violation of the NYCHRL by, *inter alia*, subjecting him to a hostile work environment and constructive discharge.

63.      As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and costs.

64.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and costs.

65.     Defendant's unlawful and discriminatory actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**

66.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

67.     By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of his race and/or sexual orientation in violation of the NYSHRL by, *inter alia*, subjecting him to a hostile work environment and constructive discharge.

68.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief.

69.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
**(Retaliation in Violation of NYSHRL)**

70.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

71.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of his protected activities in violation of the NYSHRL by, *inter alia*,

constructively discharging his employment due to his complaints race and/or sexual orientation discrimination and/or disability discrimination against other employees.

72.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief.

73.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### (Discrimination in Violation of NYCHRL)

74.     Plaintiff hereby repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

75.     By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of his race and/or sexual orientation in violation of the NYCHRL by, *inter alia*, subjecting him to a hostile work environment and constructive discharge.

76.      As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and costs.

77.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and costs.

78.     Defendant's unlawful and discriminatory actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of NYCHRL)

79.     Plaintiff hereby repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

80.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of his protected activities in violation of the NYCHRL by, *inter alia*, constructively discharging his employment due to his complaints race and/or sexual orientation discrimination and/or disability discrimination against other employees.

81.     As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm, for which he is entitled an award of monetary damages in addition to reasonable attorneys' fees and costs.

82.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, for which he is entitled to an award of monetary damages in addition to reasonable attorneys' fees and costs.

83.     Defendant's unlawful and discriminatory actions constitute knowing, malicious, willful, wanton and reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (FLSA Overtime Violations)

84.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

85.     Under the FLSA, an employer is obligated to pay an employee a premium compensation rate of one-and-one-half times the regular rate of pay for all hours worked in excess of 40 hours per week.

86.     Defendant failed to pay Plaintiff at the premium overtime rate for all hours worked in excess of 40 hours per week.

87.     Defendant's violations of the FLSA entitle Plaintiff to recover monetary damages, an additional amount in liquidated damages, attorneys' fees and costs and interest.

## SEVENTH CAUSE OF ACTION
### (NYLL §650 *et seq.* Violations for Failing to Pay Overtime)

88.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

89.     Under the NYLL, an employer is obligated pay an employee a premium compensation rate of one-and-one-half times the regular rate of pay for all hours worked in excess of 40 hours per week.

90.     Defendant failed to pay Plaintiff at the premium overtime rate for all hours worked in excess of 40 hours per week.

91.     Defendant's violations of the NYLL entitle Plaintiff to recover monetary damages, an additional amount in liquidated damages, attorneys' fees and costs and interest.

## EIGHTH CAUSE OF ACTION
### (NYLL § 191 *et seq.* Violations for Failure to Pay Wages)

92.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

93.     The NYLL requires covered employers, such as Ms. Soros, to pay employees for their owed wages with the requisite frequency.

94.     Defendant failed to pay Mr. Mohammed all his earned wages, in violation of the NYLL.

95.     Defendant's violations of the NYLL entitle Plaintiff to recover monetary damages, an additional amount in liquidated damages, attorneys' fees and costs and interest.

## NINTH CAUSE OF ACTION
### (NYLL § 161 *et seq.* Failure to Provide Day of Rest)

96.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

97.     The NYLL requires covered employers, such as Defendant, to provide at least twenty-four consecutive hours of rest in each and every calendar week.

98.     Defendant failed to provide Plaintiff with twenty-four consecutive hours of rest in each and every calendar week in violation of the NYLL.

99.     Defendant's violations of the NYLL have significantly damaged Plaintiff, and entitle him to recover statutory damages, together with attorneys' fees and costs.

## TENTH CAUSE OF ACTION
### (NYLL § 195 *et seq.* Failure to Provide Compliant Wage Notices)

100.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

101.    The NYLL requires covered employers, such as Defendant, to furnish wage notices to its employees containing, *inter alia*, the rate of pay and the rate of overtime compensation.

102.    Defendant failed to furnish compliant wage notices to Plaintiff in violation of the NYLL.

103.    Due to Defendant's violations of the NYLL, Plaintiff is entitled to recover statutory damages, together with attorneys' fees and costs.

**ELEVENTH CAUSE OF ACTION**
**(Mass. G.L.c. 151, § 1B Violations for Failure to Pay Overtime)**

104.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

105.    Under Mass. G.L.c. 151, § 1B, an employer is obligated to pay employees a premium compensation rate of one and a half times the regular rate of pay for each hour worked in excess of 40 hours per week.

106.    Under Mass. G.L.c. 149, § 190(b), when a domestic worker is required to be on duty for a period of 24 consecutive hours or more, unless a prior written agreement is made, all meal periods, rest periods and sleeping periods shall constitute working time.

107.    Defendant failed to pay Plaintiff for the hours that he worked in excess of 40 hours per week at a premium compensation rate of one and a half times his regular pay rate.

108.    Defendant's violations of the Mass. G.L.c. entitle Plaintiff to recover treble damages, an additional amount in statutory damages, together with attorneys' fees and costs.

## TWELFTH CAUSE OF ACTION
### (Mass. G.L.c. 149 § 190(b) Failure to Provide Day of Rest)

109.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

110.    Mass. G.L.c. 149, § 190(b) requires covered employers, such as Defendant, to provide domestic workers who work for at least 40 hours in a week a period of rest of at least 24 consecutive hours in each calendar week and at least 48 consecutive hours during each calendar month, unless the employer has agreed to pay the employee at the overtime rate during the rest day, and the employee agrees to this arrangement in writing.

111.    Defendant failed to provide Plaintiff with 24 consecutive hours of rest in each and every calendar week, and at least 48 consecutive hours during each calendar month, and did not obtain Plaintiff's agreement to forgo his rest period in exchange for additional pay at the premium overtime rate.

112.    Defendant's violations of the Mass. G.L.c. have significantly damaged Plaintiff, and therefore entitle Plaintiff to recover statutory damages, together with attorneys' fees and costs.

## THIRTEENTH CAUSE OF ACTION
### (Mass. G.L.c. 149, § 190(1) Failure to Provide Compliant Wage Statements)

113.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

114.    Mass. G.L.c. 149, §190(l) requires covered employers, such as Defendant, to furnish wage statements to its employees with every payment of wages containing, *inter alia*, the rate of pay, the rate of overtime compensation and the number of hours worked.

115.    Defendant failed to furnish accurate wage statements to Plaintiff in violation of the Mass. G.L.c..

116.    Due to Defendant's violations of the Mass. G.L.c., Plaintiff is entitled to recover damages, together with attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York, the City of New York and the State of Massachusetts;

B.      An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority and other benefits of employment;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputations and loss of career fulfillment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his mental anguish and emotional distress;

F.      An award of punitive damages in an amount to be determined at trial;

G.      An award of liquidated and/or treble damages in an amount to be determined at trial;

H.      An award of costs that Plaintiff incurs in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 6, 2017
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
      David E. Gottlieb
      Hilary J. Orzick

85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
dgottlieb@wigdorlaw.com
horzick@wigdorlaw.com

*Counsel for Plaintiff*